IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GLERISBET PAGAN OCASIO,<br><br>    Plaintiff,<br><br>    v.<br><br>RAAD BROADCASTING CORP.,<br><br>    Defendant | Civil No. 11-1538 (BJM) |

**OPINION AND ORDER**

Between June 5, 2008 and August 5, 2009, plaintiff Glerisbet Pagán Ocasio ("Pagán") worked as a radio host for RAAD Broadcasting Corp. ("RAAD"). During this period, Pagán claims she was the victim of sexual harassment, which created a hostile work environment for her. She sued RAAD for doing nothing about the situation. She alleges violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, as well as discrimination and tortious conduct under Puerto Rico law. Docket No. 1 ¶¶ 40-41, 47.

RAAD now moves for summary judgment. Docket No. 43. Pagán opposed (Docket No. 54) and RAAD replied (Docket No. 60). The motion for summary judgment is **granted in part** and **denied in part**.

**BACKGROUND**

The factual record is summarized here using the Local Rule 56 statements of uncontested facts, considering Docket No. 45 ("Def. St."), Docket No. 60 ("Reply"), Docket No. 55 at 1-7 ("Pl. St."), and Docket No. 55 at 7-11 ("Pl. Additional Facts").[1]

---

[1] Local Rule 56 requires parties at summary judgment to supply brief, numbered statements of facts, supported by citations to admissible evidence. It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," *CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008), and prevents litigants from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 219 (1st Cir. 2007). The rule "permits the district court to treat the moving party's statement of facts as uncontested" when not properly opposed, and litigants ignore it "at their peril." *Id.*

*The Contract*

On May 23, 2008, Pagán signed a Professional Services Contract with RAAD to be a co-hostess of a late afternoon radio show produced by La X that would air Monday through Friday from 3 p.m. to 7 p.m. Docket No. 11-1 at 1 ("Contract"). The contract stated that Pagán was an independent contractor. *Id.* at 6. She would receive an annual salary of $35,000, to be paid biweekly. *Id.* at 2. She was given fifteen days of annual leave and fourteen days of sick leave, as required by the Puerto Rico Department of Labor and Human Resources. *Id.* at 2. Pagán agreed to work exclusively for RAAD on FM radio, but she was allowed to pursue other opportunities on AM radio or TV, as a spokesperson or actress, or making commercial endorsements. Def. St. 45 ¶ 53; Pl. St. 55 ¶ 53. RAAD did not provide her with health insurance, life insurance, or retirement benefits, nor did it pay for her unemployment benefits. Def. St. ¶¶ 55-56; Pl. St. ¶¶ 55-56.

In addition to acting as a co-hostess, Pagán agreed to participate in advertising and marketing campaigns inherent to her work at no additional cost. Contract at 5-6. She also agreed to act as Master of Ceremonies in at least two activities produced by the radio station, for which she would receive $400 each. *Id.* at 5. Fees for any additional activities that Pagán wanted or was asked to participate in would be negotiated separately. Def. St. ¶ 45; Pl. St. ¶ 45. She agreed to maintain her good image and the good image of RAAD. Contract at 4.

For its part, RAAD agreed to "sell the services of talent fees for live mentions and integrations performed by [Pagán] for the amount of $30 per live mention." *Id.* at 3. Pagán was responsible for billing and collecting the fees. *Id.* The rate could be adjusted by mutual agreement in accordance with market conditions. *Id.* Pagán would also receive a 20% commission for any direct sales she made to third parties, all of which had to be approved by the Sales Manager at RAAD. *Id.* at 7.

Under the contract, Pagán was eligible for certain bonuses, including a signing bonus and a $1,000 bonus annually for working exclusively for RAAD on FM radio. *Id.*

at 3, 7. Any other bonuses would be tied to the rating of the show. *Id.* at 5. Pagán agreed to pay taxes and social security directly; RAAD did not need to withhold any taxes for her beyond the deductions required for independent contractors. *Id.* at 6.

Termination of the contract could occur in a few ways. RAAD could terminate the contract and fine Pagán $20,000 if she violated the exclusivity agreement for FM radio. *Id.* at 4. The parties could terminate the contract after giving three months' notice in writing if both parties agreed that the radio program "did not work." *Id.* at 6-7. The parties also agreed that Pagán would be in default if the program did not rank within the top five radio programs for its time slot, unless the fallen ranking was not attributable to Pagán. *Id.* at 4-5. The contract, which was to last 36 months, went into effect on June 5, 2008. *Id.* at 4.

**The Work**

For the duration of the contract, Pagán co-hosted the radio show with Ronaldo Campos ("Campos") and Juan Adames ("Adames"). Citing Pagán's deposition, RAAD states that Campos and Adames were also independent contractors. Def. St. ¶ 15. Pagán however testified that she believed that they were, but not that she knew definitively. Pl. St. ¶ 15. *See also* Docket No. 48-6 at 53 ("Pl. Deposition"). Campos was the main producer of the radio show. Def. St. ¶ 21; Pl. St. ¶ 21. He evaluated potential additional producers for the show, created the initial outline for each show, and controlled what went on air during the program as operator of the master console. Def. St. ¶¶ 28, 30, 32; Pl. St. ¶¶ 28, 30, 32. Pagán, Campos, and Adames used their own computers for the show. Def. St. ¶¶ 18-20; Pl. St. ¶¶18-20. Pagán used her personal email and cell phone to communicate with the other hosts, and her own TV and magazines to prepare for the show. Def. St. ¶¶ 35-36; Pl. St. ¶¶ 35-36.

The skills needed for the show were skills that Pagán had before signing the contract. Def. St. ¶ 34; Pl. St. ¶ 34. They included topic elaboration, improvisation, gift of words, gift of communication, how to get to the public, public recognition, the ability to

develop a mix between comedy and fun, and skills developed through acting. Def. St. ¶ 34; Pl. St. ¶ 34. However, Pagán had no prior experience as a radio show host. Pl. Additional Facts ¶ 14.[2]

Pagán often prepared for the show in advance at her home. Def. St. ¶ 37; Pl. St. ¶ 37. Pagán prepared for the show by staying current with the news. Pl. Deposition at 88. Pagán had free time during the day, but she stated that preparing for the show generally required her to be watchful of the news all of the time. Def. St. ¶ 38; Pl. St. ¶ 38. No one controlled where or when she did work to prepare for the program. Pl. Deposition at 90-91.

Pagán, Adames, Campos and the other producers (Hector Bravo, Miguel Morales, and José Calderón) controlled the contents of the radio program. Def. St. ¶ 29; Pl. St. ¶ 29. RAAD's vice president states that the producers were independent contractors. Def. St. ¶ 31. RAAD had no access to the conversations and information exchanged between Pagán, Adames, and Campos during the radio program. Def. St. ¶ 33; Pl. St. ¶ 33. Pagán states that they would normally meet at the radio station at 1 p.m. for a pre-show meeting. Pl. Additional Facts ¶ 15.[3] At the meeting, the producers would inform Pagán of the topics of conversation for the day and tell her how they wanted her to hold the conversations to attract the right audience. Pl. Additional Facts ¶ 15; Reply ¶ 3.15. Pagán states that they also told her how to dress. Pl. Additional Facts ¶ 17. RAAD's vice president says that this was only in response to complaints about her inappropriate attire. Reply ¶3.17. After the show, Pagán states that the producers would meet until 8 p.m. to discuss the next show. Pl. St. ¶ 16. RAAD's vice president says that whether this happened or not, it was not required by RAAD. Reply ¶ 3.16

---

[2] RAAD cites a prior job on her resume as evidence of prior experience. Reply ¶ 3.14. However, the resume is not translated into English and therefore is not admissible evidence. Local Rule 5(g).

[3] RAAD states that it did not require these meetings, but does not point to any evidence of this. *See* Reply ¶ 3.15.

While she was working for RAAD, Pagán pursued other opportunities. She developed her own line of jeans and hosted a television program. Deposition at 102. She also participated in nine presentations for RAAD and was paid $450 per presentation. Def. St. ¶49; Pl. St. ¶ 49.

While she worked for RAAD, Pagán used the 480.6B Informative Return tax form issued by the Puerto Rico Department of Treasury. Def. St. ¶ 57; Pl. St. ¶ 57. This form is used to report income derived from professional services. Def. St. ¶ 57; Pl. St. ¶ 57. RAAD gave her this form. Pl. Deposition at 79. In 2008 and 2009, Pagán filed Individual Income Tax Returns that show that all of her income was earned as a self-employed person. Def. St. ¶ 6, 8; Pl. St. ¶ 6, 8.

*Cancellation*

RAAD sent a letter to Pagán, Adames, and Campos on August 6, 2009 cancelling their contracts. Def. St. ¶ 41; Pl. St. ¶ 41. Afterwards, Pagán entered an unwritten agreement to continue as one of the two radio announcers for one month while RAAD looked into other alternatives for the show. Def. St. ¶ 42; Pl. St. ¶ 42.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). The court does not weigh facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir. 1995).

The movant must first "inform[] the district court of the basis for its motion," and identify the record materials "which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); R. 56(c)(1). If this threshold is met, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not prevail with mere "conclusory allegations, improbable inferences, and unsupported speculation" for any element of the claim. *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Still, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," *Leary*, 58 F.3d at 751, and the court must not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." *Greenburg v. P.R. Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).

## DISCUSSION

RAAD asserts that it was not Pagán's employer within the meaning of Title VII. RAAD additionally argues that Pagán's Article 1802 claim should be dismissed because it arises out of the same facts as her Law 100 claim. Lastly, RAAD requests that the court decline supplemental jurisdiction over Pagán's pendent claims under Puerto Rico law.

### I.    Title VII's Definition of Employer

RAAD asserts that Pagán is an independent contractor, as stated in the contract, and that therefore RAAD is not an employer under Title VII. Docket No. 44 at 10. However, the agreed-upon label in an employment contract is not conclusive. *Rivera v. Hospital Metropolitano Dr. Susoni, Inc.*, Civil No. 10-1075 (JAG/BJM), 2012 WL 3777003 at *6 (D.P.R. Feb. 27, 2012). Common law agency principles determine whether an individual is an employee or an independent contractor under Title VII. *Alberty-Velez v. Corporación de Puerto Rico Para La Difusión Pública*, 361 F.3d 1, 6 (1st Cir. 2004). This test requires the court to consider:

> the hiring party's right to control the manner and means by which the product is accomplished . . . ; the skill required; the source of the instrumentalities and tools;

>   the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 7 (quoting *Dkyes v. DePuy*, 140 F.3d 31 (1st Cir. 1998)). All of the factors must be weighed, and no one factor is decisive. *Id.* The most important factor is usually the extent to which the hiring party controls the manner and means of production. *Id.* (citing *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000)). At summary judgment, a movant cannot prevail unless "the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion." *Id.*

In this case, various factors favor classifying Pagán as an employee. For instance, RAAD paid Pagán an annual salary on a regular bi-weekly basis. In *Alberty-Velez*, the court held that an actress was an independent contractor in part because she was paid in lump sums per episode. *Id.* at 8. In contrast, in *Russel v. BSN Medical, Inc.*, the court held that the regular, monthly payment of a salary was indicative of employee status. 721 F. Supp. 2d 465, 473 (W.D.N.C. 2010) (citing *Farlow v. Wachovia Bank of N.C, N.A.*, 259 F.3d 309, 315 (4th Cir. 2001)). RAAD attempts to argue that it paid Pagán a lump sum for every ten episodes. Docket No. 44 at 20. However, it cites no evidence of this, and the contract refers to her payment as a yearly salary to be received biweekly. Contract at 2.

In addition, though Pagán did not receive health, retirement, or unemployment benefits, she received annual and medical leave. In *Rodriguez-Vega v. Policlinica la Familia de Toa Alta, Inc.*, the court held that doctors' eligibility for ten vacation days weighed in favor of finding them employees. Civil Nos. 11-2235 (FAB), 11-2236 (FAB),

2013 WL 1798017 at *11 (D.P.R. Apr. 29, 2013). *Cf. Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 946 (9th Cir. 2010) (noting that plaintiff did not receive vacation or sick days, indicating she was not an employee). Citing *Tagare v. Nynex Network Sys. Co.*, RAAD argues that this leave is merely part of the compensation package that Pagán negotiated. Motion at 21. 994 F. Supp. 149, 156 (S.D.N.Y. 1997). However, in *Tagare*, the vacation time the plaintiff received was not part of the regular benefits given to employees, and therefore was considered part of what Tagare negotiated for as an independent contractor. *Tagare*, 994 F. Supp. at 156. But there is no evidence in the record here that the leave Pagán received was different from that given to other RAAD employees, nor that she negotiated for that leave. A jury could weigh this factor in favor of employee status.

RAAD further argues that it did not control the location of the work since Pagán was able to prepare for the show wherever she wanted. Pagán argues that, on the contrary, RAAD did control the location of the work by requiring her to come to RAAD's facilities to air the program. Control of the location of work must be viewed in the context of the industry at issue. *Alberty-Velez*, 361 F.3d at 9. In *Alberty-Velez*, the television company could only produce the show by controlling the location of filming, and therefore the court held that this type of control was irrelevant to the analysis. *Id.* at 10. The relevant issue of control was whether the actress could decline to film future episodes. *Id.* at 9-10. Likewise, RAAD could only air the show by controlling the location of recording, and therefore this type of control is irrelevant. However, Pagán could not decline to participate in the radio show at her discretion, since her contract engaged her for three years. *Cf. Id.* at 4 (actress signed single-episode contracts). Furthermore, the length of this

commitment is "neither brief nor insubstantial" and could be found to favor classifying her as an employee. *Daggit v. United Food & Commercial Workers Int'l Union, Local 304A*, 245 F.3d 981, 989 (8th Cir. 2001) (explaining that UFCW stewards normally served for three years, indicating employee status).

RAAD also argues that the job of a radio broadcaster is a skilled position such that Pagán must be deemed an independent contractor. Skilled positions are those that require "relatively specialized skills," such as architects, graphic artists, computer programmers, photographers, and treasurers. *Eisenberg*, 237 F.3d at 118. Skilled positions often require extensive study and prior experience. *See Weary v. Cochran*, 377 F.3d 522, 527 (6th Cir. 2004); *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992). Indeed, in *Alberty-Velez*, the court found that an actress held a skilled position precisely because of her extensive training and prior experience. *Alberty-Velez*, 361 F.3d at 7 (plaintiff had a master's degree in public communications and journalism, was trained in dance, singing, and modeling, taught drama at the University of Puerto Rico, and acted in several productions prior to her employment in question). In *Powell-Ross v. All Star Radio*, a radio broadcaster and disc jockey was considered an independent contractor. Civil No. 95-1078, 1995 WL 491291 (E.D.P.A. Aug. 16, 1995). This was in part because "[h]er on-air radio personality [gave] her an unusual, perhaps unique, skill that would be difficult to acquire on the open market." *Id.* But this was only one factor out of many in the court's analysis. Besides her radio personality, the broadcaster only came to the station once a week during the hours of her show for under two years, she provided her own phonograph records, she was paid on commission rather than a regular salary, she received no benefits, and she was not required to take on additional duties such as public

appearances or extra time slots. *Id.* at 8. These factors combined weighed in favor of independent contractor status. *Id.*

Here, a jury could find that Pagán's position only required improvisation, the ability to reach the public, and the ability to mix comedy and fun. There is no evidence that these skills required extensive training or education to develop. Moreover, there is no evidence that Pagán had any prior experience in the industry, which permits the conclusion that her position did not require specialized skill. *See Eisenberg*, 237 F.3d at 118 (explaining that the fact that defendants did not ask plaintiff about her work experience underscored the point that her position did not require specialized skill). Even granting that she had some prior experience in the radio industry, but see note 2, *supra*, a jury need not conclude she was so highly trained that RAAD hired her as an independent contractor rather than an employee.

The most important factor in the analysis – whether RAAD was in control of the manner and means of production – is inconclusive in the summary judgment analysis. The producers were in control of the contents of the show. Def. St. ¶ 29; Pl. St. P 29. Campos, the main producer, wrote the outline for each day and controlled who spoke on air via the master console. Def. St. 21, 30, 32; Pl. St. 21, 30, 32. And RAAD had no direct access to the conversations and information exchanged between the producers during and after the show. Def. St. ¶ 33; Pl. St. ¶ 33. RAAD argues that because Campos and the other producers were independent contractors, it therefore had no control over the manner and means of production. However, the agreed-upon label of an employment contract is not conclusive in determining the nature of an employment relationship. *Rivera*, 2012 WL 37770003 at *6. The fact that RAAD nominally hired Campos, Adames, and the

other producers as independent contractors therefore says little about what type of control it had over the production of the show.

RAAD also argues that it did not control the hours Pagán spent preparing for the show, and therefore it did not control the manner and means of production. All agree that RAAD did not control how long Pagán spent preparing for the show at home. But Pagán had to be at the radio station every day at 1 p.m. for a pre-show meeting with the other producers. RAAD claims that the producers required this, and since the producers were independent contractors, it had no control over the hours she spent preparing for the show. Reply ¶ 3.15. Even granting that RAAD did not directly require the meetings, and that the producers did (but see note 3, *supra*) the fact that the producers nominally were independent contractors says little about the control RAAD had over how they prepared for the show as explained above.

Moreover, Pagán argues that the exclusivity agreement for FM radio weighs in favor of considering her an employee. Docket No. 54 at 5. Exclusivity can be a sign of control favoring employee status. *Salamon v. Our Lady of Victory Hosp.*, 867 F. Supp. 2d 344, 355 (W.D.N.Y. 2012); *Russell*, 721 F. Supp. 2d at 473. *See also Davis v. Hartland Homes, Inc.*, Civil No. 4:06CV3012, 2006 WL 2805255 (D. Neb. Sept. 28, 2006) (citing *Lerohl v. Friends of Minnesota Sinfonia*, 322 F.3d 486, 491 (8th Cir. 2003)). In *Salamon*, the doctor had privileges at other hospitals, but claimed that she rarely if ever used those privileges. *Id.* The court held that this raised a genuine issue of material fact regarding the purported employer's control over her work. *Id.* Likewise, in *Russell*, a sales representative for a company that sold medical products would have been fired if she sold other product lines. *Russell*, 721 F. Supp. 2d at 473. This weighed in favor of employee

status. *Id.* Here, Pagán was able to pursue other opportunities on AM radio or television, which she did, but she also signed an exclusivity agreement for FM radio and breaking that agreement would terminate her contract. This shows at least some control by RAAD and a reasonable jury could find that her relationship with RAAD was "in-house" rather than "free-lance." *See Lerohl*, 322 F.3d at 491.

Some factors favor classifying Pagán as an independent contractor. For instance, RAAD could not assign her additional projects beyond those stipulated in the contract, and for each additional project that she took on, RAAD paid Pagán an additional fee. Furthermore, both Pagán and RAAD classified her income as professional services rendered. This tax treatment "suggests independent contractor status." *Alberty-Velez*, 361 F.3d at 8.

Pagán also provided the instrumentalities and tools for the show. Pagán used her own magazines, newspapers, and television to stay current on topics relating to women and celebrities, and she used her own computer during the show to talk with Campos and Adames. Pagán argues that RAAD provided the instrumentalities and tools for the show by providing the microphones and equipment to air the show. However, only the equipment used by Pagán for her particular functions is relevant to the analysis. *Alberty-Velez*, 361 F.3d at 8. Here, Pagán's function was to talk with Campos and Adames about various topics, not to record and air the show. To perform these functions, she needed to stay current with the news and converse with the other hosts. To do that, she used her own TV, magazines, newspapers, and computer. Because there is no evidence that RAAD provided any of the relevant equipment, a jury could not weigh this factor in favor of employee status.

The remaining factors include whether Pagán could hire assistants, whether RAAD's regular business is radio broadcasting, and whether RAAD is currently in business. The parties do not develop arguments for any of these factors. Though RAAD claims Pagán could hire assistants, it points to no evidence in the record. *See* Docket No. 44 at 21. Pagán likewise does not point to any evidence that she could not hire assistants. *See* Docket No. 54 ¶ 33. RAAD misreads the regular business factor and discusses Pagán's line of business, see Docket No. 44 at 21, while Pagán states that radio broadcasting is RAAD's regular business, but does not cite any evidence. Docket No. 54 ¶ 34. Lastly, Pagán states that RAAD is in business without citing evidence, see *id.*, and RAAD does not discuss the matter. *See* Docket No. 54. The lack of developed arguments for these factors does not affect the outcome of the case as Pagán has already showed that a genuine issue of material fact exists regarding her employment status.

Looking at the record as a whole, the common law agency factors point in both directions. They do not point so favorably towards independent contractor status such that a fact finder could not reasonably find that Pagán was an employee. This is especially so considering that the most important factor – the control RAAD had over the means and manner of production – remains at issue. *See Rodriguez-Vega*, 2013 WL 1798017 at *12. RAAD's request is therefore denied.

If the court found that she was an independent contractor, Pagán argues in the alternative that she became a regular employee after her contract was cancelled in 2009. Docket No. 54 ¶ 37. Because summary judgment on her employment status during the contract is denied, I need not discuss this argument.

## II.     Article 1802

RAAD also seeks to dismiss the Article 1802 claim, correctly arguing that Pagán is barred from simultaneously pursuing an identical Law 100 claim. "To the extent that a specific labor law covers the conduct for which a plaintiff seeks damages, he is barred from using that same conduct to also bring a claim under Article 1802." *Rosario v. Valdes*, Civil No. 07-1508CCC, 2008 WL 509204 at *2 (D.P.R. Feb. 21, 2008). Pagán has not shown how her Article 1802 and Law 100 claims differ. RAAD's motion for summary judgment on this count is therefore granted.

## III.    Supplemental Jurisdiction

RAAD's only discussion of the claims under Puerto Rico law asks the court to decline supplemental jurisdiction. But when a district court has original jurisdiction over a civil claim, supplemental jurisdiction extends to all other claims so related that they are a part of the same case or controversy. 28 U.S.C. § 1367(a). Since the Title VII claim conferring original jurisdiction remains viable and RAAD has not argued that Pagán's other claims are outside supplemental jurisdiction, there are no grounds on which to dismiss the claims under Puerto Rico law. *See* 28 U.S.C. § 1367(c). *See also Cabrera de la Mata v. Puerto Rico Highway and Transp. Auth.*, Civil No. 10-1759 (BJM), 2012 WL 1110123 at *8 (D.P.R. Mar. 30, 2012). RAAD is not entitled to judgment on this ground.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The claim under Article 1802 of the Civil Code is **DISMISSED**. Summary judgment on Pagán's other claims is **DENIED**.

IT IS SO ORDERED.
In San Juan, Puerto Rico, this 24th day of June, 2013.

          *S/ Bruce J. McGiverin*
          BRUCE J. MCGIVERIN
          United States Magistrate Judge